# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AMY HARRIS, individually and on behalf of others similarly situated, | ) | 3:24-cv-889 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LAZ PARKING LTD, LLC, *et al.* | ) | |
| *Defendants*. | ) | February 12, 2025 |

## RULING ON DEFENDANTS' MOTION TO DISMISS

Sarala V. Nagala, United States District Judge.

Plaintiff Amy Harris, individually and on behalf of others similarly situated, brings this putative consumer class action against Defendants LAZ Parking Ltd, LLC ("LAZ LTD") and LAZ Karp Associates, LLC ("LAZ Karp"), asserting claims for breach of contract, violations of the Connecticut Unfair Trade Practices Act ("CUTPA") and the Missouri Merchandising Practices Act ("MMPA"), and civil conspiracy related to service fees charged by Defendants. Am. Compl., ECF No. 29. The amended complaint alleges, generally, that Defendants improperly charged Plaintiff and putative class members an unauthorized service fee for parking in their lots when they paid for parking through Defendants' online payment system.

Defendants have moved to dismiss Plaintiff's amended complaint in full for failure to state a claim. Defs.' Mot. to Dismiss, ECF No. 34 at 1. For the reasons described herein, Defendants' motion to dismiss is GRANTED, though Plaintiff is granted leave to amend her MMPA and civil conspiracy claims only.

## I.    FACTUAL BACKGROUND

The Court accepts the following allegations in Plaintiff's amended complaint as true for purposes of deciding Defendants' motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendants are Connecticut-based limited liability companies that own, operate, manage, and lease parking facilities throughout the United States.  Am. Compl. ¶¶ 2, 12–13, 17.  Defendant LAZ LTD is wholly owned and controlled by Defendant LAZ Karp, and the two entities share the same address as their principal place of business in Hartford, Connecticut.  *Id.* ¶¶ 18–19.

In their parking lots, Defendants post signs that display the parking rates, and in some instances applicable taxes, but do not disclose that an additional fee or surcharge may apply to the parking transaction.  *Id.* ¶¶ 2–3, 23.  Most of Defendants' parking lots require customers to pay using an online cashless payment system that can be accessed via the LAZ mobile app[1] or the LAZ website (the "Payment System"), eliminating "traditional" methods of payment such as parking attendants, meters, or ticketed gates.  *Id.* ¶¶ 29–32.  In the Payment System, customers specify the duration of their parking session and provide their vehicle information, personal information, and credit or debit card information.  *Id.* ¶ 33.  The Payment System then calculates the cost of the parking session based on the duration of the parking session, the rate posted on the parking lot signage, *and* a "service fee" that is not disclosed on the signage.  *Id.* ¶¶ 34–35.  When the customer confirms the purchase by selecting the "PAY" button, she also agrees to the "Terms & Conditions, Privacy Policy and License Plate Recognition Policy," which are linked to and contained on the LAZ app or the LAZ website.  *Id.* ¶¶ 52–53.  Further details regarding the Terms & Conditions are set forth below.

---

[1] Defendants refer to this app as the "LAZGo App."  Defs.' Opening Br., ECF No. 34-1 at 11 n.4.

Named Plaintiff Harris is a citizen and resident of Missouri.  *Id.* ¶ 11.  On December 21, 2022, she parked in a parking lot located in Missouri, operated by Defendants.  *Id.* ¶ 40.  The signage at the parking lot specified parking rates of $6.00 for the first four hours, $12.00 for four to eight hours, and $24.00 for eight to twenty-four hours, and did not disclose anything about a service fee.  *Id.* at 2; *id.* ¶ 40.  Once parked, Plaintiff accessed the Payment System to pay for four hours of parking.  *Id.* ¶ 41.  As a result of the $0.37 service fee charged for using the Payment System, Plaintiff paid a total of $6.37, rather than the posted rate of $6.00, for her four-hour session.  *Id.* ¶ 42.  In Plaintiff's view, the posted signage is an offer, not an advertisement, and the act of parking in the lot is conduct signifying her acceptance of the offer, even before she renders payment.  *Id.* ¶¶ 24–25.

Plaintiff brings this class action on behalf of herself and all other individuals in two different classes:  (1) the "Nationwide Class" and (2) the "Missouri Class."  *Id.* ¶ 65.  The Nationwide Class constitutes "[a]ll persons who during the class period were charged a 'Service Fee' by Defendants for parking in a parking lot that contains a LAZ Parking sign, the terms of which provide for parking at an hourly rate based on the duration of the parking session and do not disclose the Service Fee."  *Id.*  The Missouri Class similarly includes customers who were charged an undisclosed service fee in Missouri.  *Id.*  Plaintiff does not specify whether the Nationwide Class includes the Missouri Class.

Plaintiff brings the following claims in her amended complaint[2]:  (1) breach of contract based on parking lot signage, individually and on behalf of the members of the Nationwide Class (Count I); (2) as an alternative to the breach of contract parking lot signage claim, breach of

---

[2] After Defendants moved to dismiss her original complaint, *see* Defs.' Mot. to Dismiss, ECF No. 22, Plaintiff timely filed an amended complaint in response.  *See* Fed. R. Civ. P. 15(a)(1)(B).  Defendants thereafter moved to dismiss Plaintiff's amended complaint.

contract based on the Terms & Conditions, individually and on behalf of the members of the

Nationwide Class (Count II); (3) *per se* violations of CUTPA, individually (Count III); (4)

violation of the MMPA, individually and on behalf of the members of the Missouri Class (Count

IV); and (5) civil conspiracy, individually and on behalf of the members of an unspecified class

(Count V).[3]  *Id.* at 15–20.

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a

case or cause of action for failure to state a claim upon which relief can be granted.  When

determining whether a complaint states a claim upon which relief can be granted, highly detailed

allegations are not required, but the complaint must "contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Id.*  This plausibility standard is not a "probability

requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted

unlawfully."  *Id.*  In undertaking this analysis, the Court must "draw all reasonable inferences in

[the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether

they plausibly give rise to an entitlement to relief."  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98,

104 (2d Cir. 2011) (internal quotation marks omitted).

However, the Court is not "bound to accept conclusory allegations or legal conclusions

masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause

of action will not do," *Iqbal*, 556 U.S. at 678.  Consequently, "[t]hreadbare recitals of the elements

---

[3] The amended complaint fails to note whether the civil conspiracy claim is being brought on behalf of the Nationwide Class or the Missouri Class, and simply refers to "proposed class members."  Am. Compl. ¶¶ 110–15.

of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III.    DISCUSSION

For the reasons described below, the Court grants Defendants' motion to dismiss in full. Before addressing the merits of the claims, however, the Court examines the scope of the record it may consider in deciding this motion.

### A. Extraneous Materials

The Court concludes that it may not consider much of the evidence Defendants have submitted in support of their motion to dismiss. In particular, Defendants attached a declaration and exhibits from Adam Burke, a General Manager at LAZ Karp. *See* Burke Decl., ECF No. 34-2. These exhibits, none of which were attached to Plaintiff's amended complaint, include images of signage posted at the lot in which Plaintiff parked, screenshots of the Payment System accessed via the LAZ app, and copies of the Terms & Conditions, Privacy Policy, and License Plate Recognition Policy to which customers agree upon paying for their parking sessions on the Payment System. *Id.* ¶¶ 4–6. The Court agrees with Plaintiff that the extraneous material introduced by Defendants, except for the Terms & Conditions and the photo of the "Pay to park" sign, must be excluded for purposes of the present motion to dismiss.

When a district court is evaluating a 12(b)(6) motion, it ordinarily does not look beyond the complaint and its attached documents. *See Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011). Federal Rule of Civil Procedure 12(d) provides that "[i]f, on a motion under 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be

treated as one for summary judgment under Rule 56." *See also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) (in analyzing a 12(b)(6) motion, the district court may either exclude the extraneous material or convert the motion to one for summary judgment). The conversion of a Rule 12(b)(6) motion into a summary judgment motion when a court considers extraneous material is "strictly enforced" and "mandatory." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (cleaned up).

Notwithstanding Rule 12's conversion requirement, however, a court may still consider extraneous materials on a motion to dismiss if they are integral to the complaint. *Id.* at 156. Material is deemed integral to the complaint, and thus eligible for consideration on a motion to dismiss, where the plaintiff relies on the terms and effect of the document in drafting the complaint. *Chambers*, 282 F.3d at 153. In most instances where a document is deemed integral to a complaint, "the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Glob. Network Commc'ns*, 458 F.3d at 157. This exception "prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting." *Id.*

### 1. *Parking Lot Signage*

Plaintiff attached the below image of a rate sign to her amended complaint. Am. Compl. at 2. It is the only image that Plaintiff provides of signage at the parking lot in which she parked.



Contending that this image from the amended complaint deceptively excludes relevant details, Defendants seek to have the Court consider two additional images of parking lot signage: (1) an image of a LAZ Parking sign, which they allege to be the same sign as the one depicted in Plaintiff's amended complaint, that also shows another red sign posted directly above the rate sign; and (2) a photo of the "Pay to park" sign with a QR code and text message number. Defendants' photos are included below.





Fig. 1                              Fig. 2

Burke Decl. Ex. 1, ECF No. 34-3 at 2–3 figs. 1 & 2; Defs.' Opening Br. at 10.

The Court concludes that it cannot consider the first of these photos, but it can consider the second. As to the first photo, the red sign above the LAZ parking rate sign displays additional parking terms that are enforced by Parking Revenue Recovery Services, Inc., a third party that is not involved in the instant action. ECF No. 34-3 at 2 fig.1; Pl.'s Opp'n Br., ECF No. 37 at 20 n.8, 34. Despite Defendants' claim that the only difference between this image and Plaintiff's image from the complaint is that Plaintiff's image cuts off the sign posted above the rate sign, the Court notes that the images may not in fact be photos of the same sign, based on the background of the photographs. This discrepancy weighs in favor of disregarding Defendants' photograph. Additionally, Defendants do not argue that the red third-party sign sets forth relevant terms of the alleged contract between Plaintiff and Defendants. For these reasons, the Court does not believe it would be appropriate to consider Defendants' image of the two signs in deciding this motion.

But it is appropriate for the Court to consider the second photo of the "Pay to park" sign. The amended complaint alleges that Defendants direct customers to access the Payment System through a lot-specific QR code or text message number, though it carefully avoids mentioning that this information appears on signage. *See* Am. Compl. ¶ 31. The Court considers the photo of the "Pay to park" sign integral to the complaint, in the sense that the complaint effectively relies on it. Defendants also argue that, to the extent the Court accepts Plaintiff's theory that parking lot signage constitutes an offer, the offer is made through the combination of the rate sign and the "Pay to park" sign. Thus, the Court finds that disregarding the second sign would run afoul of the principles set forth in *Global Network Communications*, 458 F.3d at 157, regarding clever drafting by a plaintiff. Finally, while Plaintiff posits that Defendants' photos of signage should not be considered at all, she offers no specific resistance to consideration of the "Pay to park" sign photo. Therefore, the Court will consider the photo Defendants have provided of the "Pay to park" sign. *See* ECF No. 34-3 at 3 fig. 2; Defs.' Opening Br. at 11–12.

### 2. *Screenshots of Payment System*

The Court declines to consider Defendants' screenshots of the Payment System. These images display the screens Defendants contend Plaintiff would have clicked through to pay for her parking session. Defs.' Opening Br. at 12–15; Burke Decl. Ex. 2, ECF No. 34-4 at 2–9 figs. 3–10. The Court is not persuaded that the Payment System is so integral to Plaintiff's claims that it must consider screenshots not proffered by Plaintiff at the motion to dismiss stage.

Defendants primarily use these screenshots to demonstrate that the service fee was disclosed in the Payment System, in support of their view that Plaintiff was aware the service fee would be charged before she chose to pay and form a contract. *See* Defs.' Opening Br. at 12–15, 25–29. But Plaintiff's amended complaint does not focus on *how* she interacted with the Payment

System through the various screens; rather, it simply says Plaintiff was directed to pay through the Payment System, where the service fee was added to the posted rate.  Am. Compl. ¶ 4.  That Plaintiff refers to the Payment System throughout her complaint or that she provides the URL to the LAZ website, *see* Defs.' Reply Br., ECF No. 41 at 2, does not necessarily mean that Defendants' screenshots of the Payment System are properly considered on this motion, given that there is no reference in the complaint to how Plaintiff progressed through the transaction through the Payment System.  *See Glob. Network Commc'ns*, 458 F.3d at 157.  Plaintiff also disputes that the images show a consecutive series of screens, given the differing time stamps on them.  Pl.'s Opp'n Br. at 34.  This creates a concern about whether they accurately represent a transaction's progression to payment.  For these reasons, the Court cannot conclude that the amended complaint relies so heavily upon the interaction between Plaintiff and the Payment System that the disputed screenshots are properly considered on this motion.

### 3.  *Terms & Conditions and Other Policies*

Given that Plaintiff agrees that the Terms & Conditions "are integral to the [Amended] Complaint because she relies heavily on its terms and effect for her claims," Pl.'s Opp'n Br. at 34, the Court holds that it may consider the copy of the Terms & Conditions introduced by Defendants, *see* Burke Decl. Ex. 3, ECF No. 34-5, for purposes of this motion.  *See Glob. Network Commc'ns*, 458 F.3d at 157.

Finally, the Court excludes the copies of the Privacy Policy and License Plate Recognition Policy, as the two policies are only referenced in a quotation pulled from the Payment System.  *See* Am. Compl. ¶ 52.  Further, the amended complaint explicitly states that Plaintiff does not allege any claims relating to the License Plate Recognition Policy.  *Id.* ¶ 64; *see also* Pl.'s Opp'n

Br. at 14 n.5, 35.  These policies are therefore not incorporated by reference; nor does Plaintiff rely on their terms or effect in drafting her amended complaint.

In sum, the Court will consider only the Terms & Conditions and the photo of the "Pay to park" sign in ruling on Defendants' motion to dismiss.  The other images of the parking lot signage, the screenshots of the Payment System, and the copies of the Privacy Policy and License Plate Recognition Policy are excluded.

B.  Breach of Contract Claims

Plaintiff brings two claims for breach of contract in her amended complaint.  Count I asserts a claim for breach of contract against Defendants based on the parking rates visibly displayed in their parking lots.  And in case this Court were to find that the rate sign cannot form the basis of an enforceable contract, Plaintiff brings Count II as an alternative claim for breach of contract, based on the Terms & Conditions that customers must accept when they pay for their parking sessions.  Specifically, Plaintiff alleges that the Terms & Conditions apply to the Payment System and that Defendants expressly promised in the Terms & Conditions not to charge service fees.

For the reasons described below, the Court grants Defendants' motion to dismiss as to both of Plaintiff's breach of contract claims.

1.  *Count I:  Parking Lot Rate Signage*

Under Connecticut law, the "elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *AGW Sono Partners, LLC v. Downtown Soho, LLC*, 343 Conn. 309, 322 (2022) (quoting *CCT Commc'ns, Inc. v. Zone Telecom, Inc.*, 327 Conn. 114, 133 (2017)).  Regarding contract formation, "an agreement must be definite and certain as to its terms and requirements."  *Presidential Cap. Corp. v. Reale*, 231 Conn. 500, 506 (1994) (quoting *Dunham v. Dunham*, 204 Conn. 303, 313

(1987)).  "So long as any essential matters are left open for further consideration, the contract is not complete," though a court may enforce an agreement "if the missing terms can be ascertained, either from the express terms or by fair implication." *Saint Bernard Sch. of Montville, Inc. v. Bank of Am.*, 312 Conn. 811, 830 (2014).

The parties do not dispute that an agreement has been formed.  Rather, they dispute *when* a contract was formed.  In Plaintiff's view, the rate sign is an offer from Defendants that she accepted simply by pulling into a parking stall in the parking lot.  Pl.'s Opp'n Br. at 23–25.  Thus, in her view, the contract was formed by the act of parking, before she paid anything, *id.* at 25, and the addition of a service fee not disclosed on the rate sign therefore breached the enforceable agreement she had formed with Defendants to pay $6.00 for four hours of parking.  Defendants, on the other hand, argue that the rate sign is merely an invitation to contract, not an offer itself.  Defs.' Opening Br. at 23.  Defendants claim *Plaintiff* made the offer, by accessing the Payment System and inputting her location, duration of the parking session, vehicle information, personal information, and form of payment.  *Id.* at 25.  The Payment System then calculated the total price (including the service fee)—this is the offer, in Defendants' view—and Defendants accepted this offer of $6.37.  *Id.*  Defendants contend this is the only time a contract could have been formed, as the payment procedure filled in the gaps of the essential terms missing from the rate sign—total cost, time and method of payment, and the identities of the contracting parties.  *Id.* at 25–26.  In Defendants' view, then, no breach of contract occurred when the service fee was imposed, as the service fee was part of Plaintiff's offer of payment to Defendants, which Defendants ultimately accepted.

The Court cannot accept Plaintiff's theory of contract formation.  First, Plaintiff's theory contemplates the rate sign as an offer from Defendants and performance—pulling into the parking

spot—as Plaintiff's method of acceptance.  Even if the Court assumes that the rate sign is an offer[4] from Defendants, though, "an offer can be accepted by the rendering of a performance only if the offer invites such an acceptance."  *Auto Glass Express, Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 227 (2009) (quoting Restatement (Second) of Contracts § 53(1) (1981)).  Here, the signage does not invite acceptance by simply pulling into a parking spot.  Indeed, the "Pay to park" sign, which the Court considers for purposes of this motion, signals the opposite:  in order to park, the customer must *pay*, not simply occupy a parking spot.  Plaintiff's theory that she can accept Defendants' offer by parking therefore does not carry the day.

Second, Plaintiff could not have formed a contract with Defendants simply by parking because essential terms of the parties' agreement remained unsettled at that point.  Most importantly, because the rate sign offers three different parking time options, each with different pricing, there could not have been a mutual understanding between the parties as to central terms of the bargain—length of time and price—when Plaintiff pulled into a parking spot.  At that point, Defendants did not know how long Plaintiff planned to park and how much she would owe Defendants in return.  That is not to say that all essential terms were left open; indeed, although Defendants contend that how a customer is to pay is not clear from the signage, the "Pay to park" sign appears to fill that gap.  Nonetheless, the critical terms of the parties' agreement were "left open for further consideration" and were not fixed when Plaintiff parked.  *Saint Bernard Sch. of Montville*, 312 Conn. at 830.  Thus, there is no mutual understanding of the terms of the contract, and it cannot be complete at that point, as Plaintiff asserts.

Plaintiff's heavy reliance on *Franklin v. Parking Revenue Recovery Services, Inc.*, 832 F.3d 741 (7th Cir. 2016), a Fair Debt Collection Practices Act case, is unavailing.  There, the

---

[4] Because Plaintiff's theory fails even if the signage is considered an offer from Defendants, the Court does not reach Defendants' argument that the rate sign is an advertisement, rather than an offer.

Seventh Circuit concluded that the act of parking in a parking lot signified acceptance of the offer to park at the price stated on the lot's signage. *Id.* at 745. But, critically, the parking lot at issue in *Franklin* offered a flat rate of $1.50 per day. *Id.* at 742. The essential term of price was therefore fixed, in contrast to the parking lot at issue here, which offered various pricing options dependent upon the length of stay.

Finally, the Court rejects Plaintiff's contention that paragraph 62 of her amended complaint salvages her breach of contract claim related to lot signage. Plaintiff alleges, "[o]n information and belief," that Defendants consider their rate signs "sufficient to form a contract once the customer parks, because [they] seek[] to collect and [have] collected parking fees from customers who park but never pay through the Payment System." Am. Compl. ¶ 62. But Connecticut contract law recognizes an "objective theory of contracts" that is not dependent on "the secret intention of a party." *Conn. Light & Power Co. v. Proctor*, 324 Conn. 245, 267 (2016). Therefore, to the extent Plaintiff uses this allegation to suggest that Defendants believe a contract is formed when a customer pulls into a parking spot, Defendants' alleged intent is irrelevant and must be disregarded. And Plaintiff's general allegation, on information and belief, that Defendants collect parking fees from customers who do not pay cannot overcome the Court's analysis above with respect to formation of the specific contract between Plaintiff and Defendants—namely, that Defendants' alleged offer does not invite acceptance by performance and that a contract cannot be formed when Plaintiff pulls into a parking spot because the essential terms of the contract remain indefinite until Plaintiff pays through the Payment System. Of course, there is intuitive appeal to Plaintiff's contention that, if her use of the Payment System constituted the offer, it would not make sense for her to offer more than the posted rate of $6.00. *See* Pl.'s Opp'n Br. at 26. But the fact remains that she did, in fact, choose to pay $6.37, rather than $6.00, for four hours of parking

when she utilized the Payment System.  At that point, the agreement became "definite and certain as to its terms and requirements," and thus became enforceable.  *Presidential Cap. Corp.*, 231 Conn. at 506 (quoting *Dunham*, 204 Conn. at 313).  And Defendants did not breach that agreement, which contemplated payment of $6.37 for the privilege of parking for up to four hours.

In sum, the Court holds that a contract was formed only after Plaintiff completed the transaction through the Payment System.  Thus, Plaintiff has not plausibly alleged that Defendants breached the alleged agreement to provide her a parking spot for four hours for $6.00, as advertised on the rate sign.  Defendants' motion to dismiss Count I is therefore granted.

### 2. *Count II:  Terms & Conditions*

Plaintiff brings this second breach of contract claim based on Defendants' Terms & Conditions, as an alternative to her breach of contract claim based on the parking lot rate signage. Am. Compl. ¶ 88.  Section V of the Terms & Conditions states that "LAZ, in providing the Service, does not set the parking prices, operate the parking facilities, determine parking availability or charge you for any parking fees or services provided."  ECF No. 34-5 at 3.  Plaintiff argues that, if the Court finds Plaintiff and the class formed a contract that includes the Terms & Conditions, then Defendants breached the Terms & Conditions by imposing the service fee.  Am. Compl. ¶¶ 88–90.

But the plain text of the Terms & Conditions makes clear that it does not apply to Harris's transaction, even if she had to agree to the Terms & Conditions in order to pay for her parking session.  The preamble specifies that the Terms & Conditions governs the customer's "use of the LAZ online parking reservation system (the 'System'), which is owned and operated by LAZ KARP Associates, LLC, ('LAZ')" and that the customer's "access to, and use of, the System and the services, products and networks found at or related to the System (referred to collectively as

the 'Service') are subject to the following Terms and Conditions."  ECF No. 34-5 at 2.  The "System" and "Service" referred to in the Terms & Conditions are not the same as the "Payment System" that Plaintiff used to pay for her parking session; rather, the "Service provided by LAZ pursuant to the System is limited to" only two uses:  (1) "informing users of the location and potential availability of parking spots"; and (2) "providing customers the ability to book parking." *Id.*  The "System" is the platform that a customer uses to access the "Service."  As defined by the Terms & Conditions, then, neither the "System" nor the "Service" have anything to do with payment.  Thus, the promise that "LAZ . . . does not set the parking prices, operate the parking facilities, determine parking availability or charge you for any parking fees or services provided" applies only when a customer looks up the location and availability of parking spots and reserves parking spots in parking lots that certain third parties, including "LAZ related entities," own, lease, manage, or operate.  *Id.* at 2, 3.  Neither LAZ Karp nor LAZ LTD promise not to charge a service fee on payments made via the LAZ app or the LAZ website.

Accordingly, the Court finds that Defendants do not breach the Terms & Conditions when they charge service fees on payments made via the LAZ app and website.  Count II is therefore dismissed.

### C.  Count III:  CUTPA

Next, the Court finds that Plaintiff's individual CUTPA claim must be dismissed.  Plaintiff alleges that Defendants' practice of charging service fees violates Conn. Gen. Stat. § 42-133ff, which prohibits the imposition of surcharges on any transaction, and Conn. Agencies Regs. § 42-110b-22, which prohibits advertisements that fail to conspicuously state a material contingency, condition, or limitation in a location reasonably adjacent to the offer.  But given that the parking transaction at issue occurred in Missouri and its connection to trade or commerce in Connecticut

is, at best, tenuous, the Court finds that CUTPA does not apply and dismisses Count III without leave to amend.

As a general matter, CUTPA provides that "[n]o person shall engage in . . . unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). "Trade" and "commerce" are defined as the "advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value *in this state*." Conn. Gen. Stat. § 42-110a(4) (emphasis added).

The extent of CUTPA's geographical reach is murky. The District of Connecticut first took up the question in *H & D Wireless Limited Partnership v. Sunspot*, No. H-86-1026 (PCD), 1987 U.S. Dist. LEXIS 16951, at *4 (D. Conn. Feb. 24, 1987), holding that CUTPA "merely requires that the violation be tied to a form of trade or commerce intimately associated with Connecticut" and "does not necessarily require that the CUTPA violation occur" in Connecticut. (first citing *S. Marine Rsch., Inc. v. Jetronic Indus., Inc.*, 590 F. Supp. 1192 (D. Conn. 1984); and then *Couchon v. LeBron, Inc.*, 33 Conn. Supp. 628 (Conn. Super. Ct. 1976)). Upon close examination, however, neither of the two authorities cited in support of this reading analyze the geographical reach of CUTPA. Specifically, *Southern Marine Research* involved Lanham Act and CUTPA violations, but the decision was about venue, not the extraterritorial reach of CUTPA. *See* 590 F. Supp. at 1193, 1195. *Couchon* did not analyze CUTPA at all, and instead involved personal jurisdiction issues and the Connecticut Unfair Sales Practices Act, which was repealed in 1973. 33 Conn. Supp. at 634–36, 634 n.2. *H & D Wireless* did not cite to any Connecticut state court decisions analyzing the geographic scope of CUTPA.

Nonetheless, *H & D Wireless*' construction was repeated by the District of Connecticut in *Uniroyal Chemical Co. v. Drexel Chemical Co.*, 931 F. Supp. 132, 140 (D. Conn. 1996), which noted that there exist two rationales for supporting the application of CUTPA to extraterritorial conduct: (1) the violation is tied to a form of trade or commerce intimately associated with Connecticut, as articulated in *H & D Wireless*, and (2) where choice of law principles indicate that Connecticut law applies, *i.e.*, looking at "where the injury was sustained" or "where the 'economic impact' is felt." The latter rationale was based on an interpretation of *Bailey Employment System, Inc. v. Hahn*, 655 F.2d 473 (2d Cir. 1981).

Although a number of state and federal trial court decisions have examined the geographical reach of CUTPA based on one or both of the rationales described in *Uniroyal Chemical*, there does not appear to be any definitive guidance from Connecticut appellate courts on the issue. In *Cohen v. Roll-A-Cover, LLC*, the Connecticut Appellate Court noted, but declined to explicitly endorse, that the District of Connecticut has "held that CUTPA does not require that a violation actually occur in Connecticut, if the violation is tied to a form of trade or commerce intimately associated with Connecticut, or if, where Connecticut choice of law principles are applicable, those principles dictate application of Connecticut law." 131 Conn. App. 443, 464–45 (2011) (first citing *Uniroyal Chem. Co.*, 931 F. Supp. at 140; and then *Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher-Price, Inc.*, 406 F. Supp. 2d 175, 200 (D. Conn. 2005)).

The Connecticut Appellate Court, however, later explicitly rejected the notion that CUTPA could apply outside of Connecticut and held that CUTPA has no extraterritorial effect, as it plainly and unambiguously "proscribes only unfair trade practices occurring *within the state of Connecticut.*" *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.* (*W. Dermatology I*), 146 Conn. App. 169, 200 (2013) (emphasis added). In *Western Dermatology I*, the Connecticut

18

Appellate Court held that, although the defendant's corporate headquarters were in Connecticut, none of the "complained about activities" regarding the sale of allegedly malfunctioning software had occurred in Connecticut, so CUTPA could not apply. *Id.* The Appellate Court also concluded, secondarily, that choice of law principles dictated CUTPA should not apply to the defendant's actions. *Id.* When the case reached the Connecticut Supreme Court, that court affirmed the Connecticut Appellate Court's ultimate holding that CUTPA did not apply to the plaintiff's claim, but determined that the Appellate Court should have disposed of the action by resolving only the choice of law issues, without reaching the question of the geographic scope of CUTPA. *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.* (*W. Dermatology II*), 322 Conn. 541, 561–63 (2016).

The question of CUTPA's applicability to extraterritorial conduct therefore remains open, as the Connecticut Supreme Court expressly declined to reach the question of whether the defendant had engaged in trade or commerce in Connecticut to establish a CUTPA violation. *Id.* at 561 n.14. Thus, the Court looks generally to *Cohen* and *Western Dermatology I* for guidance on resolving the question before it. *See Gilbert v. Newton*, No. 13-CV-1715 (JCH), 2015 WL 3755955, at *4 (D. Conn. June 15, 2015) ("The Second Circuit has explained that federal courts are bound to apply the law as interpreted by a state intermediate appellate court unless there is persuasive evidence that the highest court of the state would reach a different conclusion.").

The Court concludes that Plaintiff fails to allege that Defendants have engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce" in the state of Connecticut, as would be required to pursue a claim under CUTPA. In her amended complaint, Plaintiff asserts that Defendants' creation and use of the Payment System, as well as the decision to impose a service fee on transactions made on the Payment System, "emanate from business practices

occurring in Connecticut." Am. Compl. ¶ 45. The Court does not believe Connecticut courts would find this allegation sufficient to sustain a CUTPA claim.

First, the plain language of the statute defining "trade" and "commerce" under CUTPA forecloses Plaintiff's interpretation. Conn. Gen. Stat. § 42-110a(4) defines "trade" and "commerce" as the "advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value *in this state*." Conn. Gen. Stat. § 42-110a(4) (emphasis added). Here, even accepting as true that Defendants engaged in some unspecified business practices in Connecticut from which decisions regarding the Payment System "emanated," it remains the case that Defendants offered the service at issue, *i.e.*, the parking space, to Plaintiff in the state of Missouri, not in the state of Connecticut. Thus, under the plain language of the statute, Defendants' alleged acts do not involve trade or commerce—that is, "advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services"— in Connecticut. *See id.*

*Western Dermatology I*'s reasoning supports this conclusion. The trial court in *Western Dermatology I* found that the defendant's corporate headquarters were located in Connecticut, the relevant sales agreement was drafted in Connecticut, and "[c]orporate responsibility for product development, marketing, sale and delivery of a functioning product [was] most strongly connected to Connecticut." *W. Dermatology v. Vital Works, Inc.*, No. DBDCV065001239S, 2012 WL 2334567, at *4 (Conn. Super. Ct. May 18, 2012). Despite these factual findings, the Connecticut Appellate Court concluded that the defendant's unfair or deceptive acts were *not* conducted in Connecticut for purposes of CUTPA, because, in part, the services rendered to the plaintiff were performed outside of Connecticut. *W. Dermatology I*, 146 Conn. App. at 200.

In addition, Plaintiff's reliance on *Cohen* is misplaced.  There, the Connecticut Appellate Court did not endorse the view that CUTPA applies to violations tied to a form of trade or commerce intimately associated with Connecticut; it simply noted that the federal courts had said as much.  *Cohen*, 131 Conn. App. at 464–65 (reviewing past interpretations of the geographical reach of CUTPA).  In *Cohen*, it was clear the defendants had engaged in unfair or deceptive acts in the state of Connecticut because the plaintiff had visited the defendants' manufacturing facility in Bethany, Connecticut to acquire more information about the defendants' products before the plaintiff entered into an agreement to distribute the defendants' products in New Jersey.  *See id.* at 446–48.  During negotiations, the defendants provided false and misleading information about the quality, attributes, and worldwide distribution of their products, as well as their sales volume, consumer demand, and patents and trademarks.  *Id.* at 447.  Although the discussions following the plaintiff's visit to the defendants' manufacturing facility, as well as execution of the contract, occurred outside of Connecticut, there was no question that at least some of the defendants' deceptive acts actually happened during the plaintiff's visit to Connecticut.  *Id.* at 446–47.  Here, by contrast, even assuming that Plaintiff need not prove that she experienced "the economic impact of an ascertainable loss under CUTPA" in Connecticut, *see id.* at 466–67, she has not shown how *any* part of her specific parking transaction can be tied to Connecticut, as the plaintiff was able to show for the events at issue in *Cohen*.

For these reasons, the Court does not believe that Plaintiff's bare allegation that Defendants engaged in business practices in Connecticut from which decisions about imposing the service fee "emanated" suffices to state a CUTPA claim, and therefore dismisses that claim.  The Court does

not reach Defendants' other arguments concerning Plaintiff's CUTPA claim, including

Defendants' argument that Conn. Gen. Stat. § 42-133ff is unconstitutional.[5]

### D.  Count IV:  MMPA

Finally, the Court dismisses Plaintiff's MMPA claim.

The MMPA provides:  "The act, use or employment by any person of any deception, fraud,

false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression,

or omission of any material fact in connection with the sale or advertisement of any merchandise

in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice."

Mo. Ann. Stat. § 407.020.1.  "The purpose of the [MMPA] is to supplement the definitions of

common law fraud in an attempt to preserve fundamental honest, fair play and right dealings in

public transactions."  *Schulte v. Conopco, Inc.*, 997 F.3d 823, 826 (8th Cir. 2021) (citations and

internal quotation marks omitted).  Certain defenses, such as the voluntary payment doctrine, are

not available as a defense to an MMPA violation.  *Huch v. Charter Commc'ns, Inc.*, 290 S.W.3d

721, 727 (Mo. 2009) (*en banc*).

To state a claim under the MMPA, a plaintiff must show that she (1) leased or purchased a

product or service from defendant; (2) primarily for personal, family, or household purposes; and

(3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful

under the MMPA.  *Schulte*, 997 F.3d at 825–26.  After a 2020 amendment to the statute, a plaintiff

---

[5] Plaintiff alleges that the service fee is a *per se* violation of CUTPA because Conn. Gen. Stat. § 42-133ff prohibits the imposition of surcharges on transactions.  Am. Compl. ¶ 94.  In addition to their other arguments for dismissal of Plaintiff's CUTPA claim, Defendants argue that Conn. Gen. Stat. § 42-133ff is unconstitutional.  *See* Defs'. Opening Br. at 38–39.  The Court notified the Connecticut Attorney General of Defendants' challenge to the constitutionality of Conn. Gen. Stat. § 42-133ff.  *See* Certification to State Attorney General of Constitutional Challenge to State Law, ECF No. 45.  Pursuant to Federal Rule of Civil Procedure 5.1, the Court allowed the Attorney General sixty days to file a motion to intervene and respond to Defendants' motion to dismiss regarding the constitutionality of the statute. *Id.*  Since the Court dismisses Plaintiff's CUTPA claim on an independent ground and does not reach the question of the constitutionality of Conn. Gen. Stat. § 42-133ff, the Court does not believe it must wait the requisite sixty days for the Attorney General to move to intervene, and may issue this ruling forthwith.

must also establish (a) that she "acted as a reasonable consumer would in light of all circumstances"; (b) "[t]hat the method, act, or practice declared unlawful by [the MMPA] would cause a reasonable person to enter into the transaction that resulted in damages"; and (c) that she incurred "[i]ndividual damages with sufficiently definitive and objective evidence to allow the loss to be calculated with a reasonable degree of certainty." Mo. Ann. Stat. § 407.025.1(2); *see also Bell v. Annie's, Inc.*, 673 F. Supp. 3d 993, 998 (E.D. Mo. 2023). Under the statute, "[a] court may dismiss a claim as a matter of law where the claim fails to show a likelihood that the method, act, or practice alleged to be unlawful would mislead a reasonable consumer." Mo. Ann. Stat. § 407.025.1; *see also Abbott v. Golden Grain Co.*, 677 F. Supp. 3d 940, 946 (E.D. Mo. 2023) ("The 2020 amendments also empower courts to dismiss as a matter of law cases that previously may have made it past the motion-to-dismiss stage.").

Plaintiff alleges, on behalf of herself and the Missouri Class, that Defendants violated the MMPA in four different ways. *See* Am. Compl. ¶ 104. First, she asserts that Defendants' conduct constitutes a "false promise" because their signs offer specific rates but later charge more than those promised rates. *Id.* ¶ 105. Second, she alleges that Defendants' conduct constitutes an "unfair practice" because they engage in a "method, use, or practice that violates state law intended to protect the public, including [Connecticut's] statutory prohibitions against surcharges." *Id.* ¶ 106. Third, she asserts that Defendants' conduct violates the MMPA because it: "(a) is unethical, oppressive, or unscrupulous; and (b) causes substantial injury to consumers; (c) offends public policy as established by the statutes or common law of Missouri, the Federal Trade Commission, and its interpretative decisions; (d) is a unilateral breach of a consumer contract; and (e) violates LAZ's duty of good faith and fair [dealing] by contracting with Missouri consumers in a dishonest manner." *Id.* ¶ 107. Finally, she alleges that Defendants' conduct constitutes "the concealment,

suppression, or omission" of a material fact by imposing "[h]idden junk fees" on top of the rates listed on their signs. *Id.* ¶ 108.

The Court holds that Plaintiff fails to state a claim under the MMPA, as the amended complaint "fails to show a likelihood" that Defendants' parking rate sign "would mislead a reasonable consumer." Mo. Ann. Stat. § 407.025.1. She alleges that the sign, which did not disclose the service fee charge, misled her to believe that her parking session would cost only $6.00, not $6.37. *See* Am. Compl. ¶ 105. She also alleges that she and members of the Missouri class "suffered an ascertainable loss by paying more for parking than they would have had LAZ not engaged in a deception." *Id.* ¶ 109. She fails, though, to establish the additional elements required by the amended MMPA. Nowhere in her amended complaint does she demonstrate that she "acted as a reasonable consumer would in light of all circumstances" or that a reasonable consumer would have been similarly misled by Defendants' conduct.

It is only in her opposition to Defendants' motion to dismiss that she closes the loop and conclusorily "asserts a reasonable consumer would be deceived by [Defendants'] conduct because the acts caused Plaintiff and the putative class to 'pay[] more for parking than they would have had LAZ not engaged in' its wrongful acts." Pl.'s Opp'n Br. at 45 (second alteration in original). But it is well-settled that a plaintiff cannot amend its complaint by asserting new facts through an opposition to a motion to dismiss. *See Killoran v. Westhampton Beach Sch. Dist.*, No. 21-cv-3264 (JS) (SIL), 2022 WL 4484630, at *8 (E.D.N.Y. Sept. 27, 2022). Even if such an allegation were included in Plaintiff's amended complaint, however, it is still conclusory and does not "show a likelihood" that Defendants' conduct "would mislead a reasonable consumer," as the MMPA requires. *See Ellison-Robbins v. Bimbo Bakeries USA, Inc.*, --- F. Supp. 3d ---, No. 4:23-cv-00232-SEP, 2024 WL 4332049, at *2, 5 (E.D. Mo. Sept. 27, 2024) (dismissing complaint that showed

"some things about consumer behavior," but provided only "unsupported conclusory allegations" to support the claim that a reasonable consumer would be misled).  It may be, for instance, that a reasonable consumer expects to pay a modest service fee when paying for parking through an online payment service.  Plaintiff's amended complaint does not provide any plausible factual allegations to overcome the MMPA's clear directive that dismissal is appropriate when the complaint fails to show a likelihood that the practice alleged to be unlawful would mislead a reasonable consumer.  *See* Mo. Ann. Stat. § 407.025.1.

Accordingly, based on Plaintiff's failure to establish a likelihood that Defendants' conduct would mislead a reasonable consumer, the Court dismisses the MMPA claim.  The Court does not reach whether the other elements required under the MMPA have been met.

E.  Count V:  Civil Conspiracy

Finally, the Court dismisses Plaintiff's claim for civil conspiracy, as it cannot survive absent a plausible allegation of a substantive tort.

The elements of a civil action for conspiracy are:  "(1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff."  *Harp v. King*, 266 Conn. 747, 779 (2003). "There is, however, no independent claim of civil conspiracy.  Rather, the action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself. Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort."  *Macomber v. Travelers Prop. & Cas. Corp.*, 277 Conn. 617, 636 (2006) (quoting *Harp*, 266 Conn. at 779 n.37) (cleaned up).

As the Court has dismissed the CUTPA and MMPA claims, there is no allegation of a substantive tort with which Plaintiff's claim of civil conspiracy may be joined.  On a separate note, Plaintiff fails to specify on behalf of which class she brings the civil conspiracy claim, although the reference to "classes" suggests that she is bringing the claim on behalf of the Nationwide Class and the Missouri Class.[6]  *See* Am. Compl. at 19–20 (mentioning only "classes" and "proposed class members").  Thus, even if the CUTPA and MMPA claims were allowed to proceed, the civil conspiracy class claim on behalf of the Nationwide Class would likely be dismissed because Plaintiff brings the CUTPA claim on behalf of herself only and the MMPA claim on behalf of the Missouri Class, not the Nationwide Class.  *Id.* ¶¶ 93, 104.

Accordingly, the Court dismisses the civil conspiracy claim.

F.  <u>Leave to Amend</u>

Plaintiff has not expressly requested leave to amend, in the event the Court were to dismiss any of her claims.  The Court acknowledges, too, that Plaintiff has already amended once. Nonetheless, it believes it is appropriate to grant Plaintiff leave to amend as to her MMPA and associated civil conspiracy claims only.  *See* Fed. R. Civ. P. 15(a)(2).

Leave to amend the CUTPA claim would be futile, in light of the Court's conclusion that CUTPA does not apply to Plaintiff's parking transaction.  *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (noting leave to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party" (quoting *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008))).  Likewise, leave to amend

---

[6] As noted earlier in the ruling, it is unclear whether the Nationwide Class includes the Missouri Class.

would be futile as to Plaintiff's breach of contract claims, as the Court rejects the legal underpinnings of those claims. *Id.*

## IV.    CONCLUSION

For the reasons described herein, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint is GRANTED.  Plaintiff's claims in Counts I, II, III, IV, and V are dismissed; the dismissals as to Counts I, II, and III are without leave to amend.  The Court grants Plaintiff leave to amend for a second time, to attempt to remedy the deficiencies identified in this order as to Counts IV and V only.[7]  Any Second Amended Complaint shall be filed by March 5, 2025. Defendants shall answer or otherwise respond to the Second Amended Complaint by March 19, 2025.


**SO ORDERED** at Hartford, Connecticut, this 12th day of February, 2025.


 */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE

---

[7] Leave is granted only as to the claims alleged in the amended complaint, ECF No. 29; to the extent Plaintiff seeks to add any new claims, she must file a separate motion for leave to amend to include those claims.  Any such motion for leave to amend will be governed under Federal Rule of Civil Procedure 15, since no scheduling order has yet issued. *See Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021).